UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| MARY ELLEN TOOHEY,<br>individually and on behalf of all others similarly<br>situated,<br><br>                              Plaintiff,<br><br>              v.<br><br>PORTFOLIO RECOVERY ASSOCIATES, LLC,<br>PRA GROUP, INC., MALEN & ASSOCIATES, P.C.<br><br><br><br>                              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

Index No.:


**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**



**FILED VIA ECF**

        Plaintiff Mary Ellen Toohey, individually and on behalf of all others similarly situated, by her undersigned attorneys, alleges as follows for her Class Action Complaint against defendants Portfolio Recovery Associates, LLC and PRA Group, Inc. (together, "PRA"), and Malen & Associates ("Malen") (collectively, with PRA, "Defendants").  These allegations are made on information and belief, and pursuant to the investigation of Plaintiff's counsel.


<u>**NATURE OF THE CASE**</u>

        1.        Last month, the Consumer Financial Protection Bureau ("CFPB") penalized Portfolio Recovery Associates, LLC roughly $27 million in conjunction with a consent order with PRA for PRA's rampant violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 USC § 1692 et seq.[1]

---

[1]        *See* Consent Order, *In re* Portfolio Recovery Assocs., LLC, File No. 2015-CFPB-0023 (Consumer Fin. Prot. Bureau Sept. 8, 2015), annexed hereto as Exhibit A.

2.      PRA is a consumer debt collector.[2]  The CFPB found that PRA engages in the widespread practice of submitting false or deceptive affidavits to state and local courts in order to fraudulently obtain tens of thousands of default judgments against consumers for phantom debts.  Indeed most, if not all, of the judgments PRA obtains are default judgments, as very few consumer-defendants in debt-collection cases take steps to defend themselves.[3]

3.      The CFPB found that the PRA employees who fill out PRA's affidavits **do not review any actual evidence** that would substantiate PRA's actions against individual consumers, such as a cardholder agreement bearing the alleged debtor's signature.  Instead, they merely glance at summary data on a computer screen.[4]  PRA requires its affiants to fill in templates, indiscriminately generating boilerplate affidavits in which the affiant falsely attests or implies that he or she possesses personal knowledge of a particular consumer's account-level documentation.  In reality, the affiant possesses no such personal knowledge.[5]

---

[2]  "Consumer debt" and "debt" as used herein "mean[] any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes . . . ."  15 U.S.C. § 1692a(5).  "Debt collector" as used herein "means any person [or entity] who [or that] uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who [or that] regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).

[3]  PRA takes advantage of the fact that, under most states' civil procedure law, the public employees who oversee the default-judgment process engage in a largely ministerial function, relying upon the representations and certifications of the attorneys who practice before the court.  Given that tens of thousands of such lawsuits are filed every year, judicial system personnel would be overwhelmed if they had to investigate the validity of each and every default judgment application.

[4]  Consent Order, *supra* note 1, at 14.

[5]  *Id.* at 13–15, 24–25.

4.     A court's power to issue a final judgment, such as a default judgment, may only be invoked upon a foundation of admissible evidence.  In most consumer debt-collection cases, the underlying documentation concerning a purported debt has been generated by the credit-issuer's computer system, and is therefore hearsay under state law throughout the nation.  State and local courts have allowed such documentation into evidence under the limited business records exception to the hearsay rule, but only so long as an affiant with personal knowledge of the credit-issuer's records has verified the specific account-level records at issue and attested to their veracity.  These minimal evidentiary requirements are an essential safeguard of consumers' rights.

5.     It is impossible for PRA to meet these requirements, as PRA purchases its debt at an average of less than **5%** of face value because the entities that sell PRA phantom debts ("Sellers") lack valid evidence that individual consumers owe them anything.  The purchase agreements for the phantom debt "put[] PRA on notice that information in the Sale File might be inaccurate, incomplete, or otherwise unreliable.  For example, a [Seller] may have specifically disclaimed the accuracy of information in the Sale File, notified PRA that documentation is unavailable, or notified PRA that a percentage of accounts in a portfolio are disputed or barred by the applicable statute of limitations."[6]  Even where the Sellers provide some documentation, no employee at PRA has the personal familiarity with the process of the Sellers' records' creation and maintenance in order to attest to personal knowledge of those documents in court.

6.     Without sufficient account-level documentation—or access to anyone with personal knowledge of a consumer's account—PRA knows it cannot make out a prima facie case demonstrating the existence of any of its consumer debts.  As the CFPB's findings reveal,

---

[6]  Consent Order, *supra* note 1, at 7–8.

engaging in a pattern and practice of abusing the judicial system is an essential component of PRA's business model: PRA could not collect on its consumer debts any other way.

7.     PRA uses its fraudulently obtained judgments to dupe local law enforcement officials around the United States into facilitating the electronic transfers of moneys out of consumer-defendants' employers' bank accounts and into PRA's coffers.   Having never possessed an iota of the admissible evidence that would justify any such transfer, PRA's scheme amounts to systematic fraud upon financial institutions and the interstate mails and wires.   The end result is that PRA has, with the essential assistance of its in-house counsel and outside law firms, commandeered and distorted the judicial process, solely for the sake of financial gain.

8.     The CFPB's findings reveal that PRA has systematically abused state and local judicial systems nationwide.[7]  PRA's fraud upon the New York State judicial system presents a particularly egregious example.   New York law imposes substantial evidentiary requirements on litigants that seek to secure default judgments against their opponents.   In April 2014, Chief Judge Jonathan Lippman of the New York State Court of Appeals, responding to increasing concerns about widespread litigation abuses on the part of consumer debt-buyers like PRA, publicly reiterated that "the law requires a [debt-buyer] seeking a default judgment to provide some **firsthand confirmation of the key facts in the case** . . . ."[8]   As the CFPB's findings

---

[7]   Upon information and belief, approximately 40% of the amounts collected on purported consumer-credit debt by PRA's in-house and outside counsels in the United States are extracted from victims in four states: California, Texas, Florida, and New York.   However, the scope of PRA's unlawful litigation strategy is nationwide.

[8]   Press Release, N.Y. State Unified Court Sys., Chief Judge Announces Comprehensive Reforms to Promote Equal Justice for New York Consumers in Debt Cases (Apr. 30, 2014) (emphasis added), annexed hereto as Exhibit B.

establish, PRA generally cannot provide "firsthand confirmation of the key facts" concerning the allegedly delinquent accounts that it purchases.

9.      PRA could not succeed in its fraudulent scheme without the assistance of both in-house counsel and outside counsel.[9]   These attorneys, who are sworn officers of the court, forsake their legal and ethical duties to the court by filing affidavits that they know to be both deceptive and insufficient as a matter of evidentiary law.  The outside law firms with which PRA conspires collect approximately $200 million annually on behalf of PRA, accounting for nearly one-third of PRA's total consumer-credit collections in the United States in a given year.[10] These co-conspirators profit handsomely for their fraudulent conduct, raking in between approximately $30 million and $50 million annually.

10.      PRA's and its outside law firms' systematic abuse of state and local courts has enabled them to extract millions of dollars from unprotected consumers in the form of wage garnishments and/or settlement agreements to which PRA was not entitled.  In 2014 alone, PRA took roughly $371.3 million out of American consumers' pockets through its litigation-based collection methods.  Plaintiff and the class, "the majority of whom are low-income or working people,"[11] deserve redress.

---

[9]   PRA directly employs in-house attorneys who engage in the fraudulent practices described above.

[10]   PRA's in-house counsel generally collect tens of millions of dollars fewer than PRA's outside counsel in any given year.

[11]   Press Release, N.Y. State Unified Court Sys., *supra* note 8.

## JURISDICTION AND VENUE

11.     Defendants conduct business in the State of New York.  Venue is proper because PRA's New York State headquarters are in this District, and Defendants' fraud upon Plaintiff was coordinated in this District.

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 & 1337, and under 15 U.S.C. § 1692k(d) and 18 U.S.C. §§ 1964 & 1965.

13.     This Court has jurisdiction over the New York state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court also has jurisdiction over all the claims under 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"), in that "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a state different from any defendant."

## PARTIES

### Plaintiff

15.     Plaintiff Mary Ellen Toohey is a resident of the State of New York.  At the time of the events described herein, Ms. Toohey resided in New York.  Ms. Toohey is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated and maintained at least one action against Ms. Toohey alleging claims related to consumer debt.

### Defendants

16.     Defendant Portfolio Recovery Associates, LLC is a Delaware Limited Liability Company that transacts business in the State of New York.  Portfolio Recovery Associates, LLC maintains offices at 120 Corporate Boulevard, Norfolk, Virginia 23502, and at 100 Park Avenue, Suite 1600, New York, New York 10017.   Portfolio Recovery Associates, LLC regularly

attempts to collect debts alleged to be due to another.  Portfolio Recovery Associates, LLC is, either directly or indirectly, a wholly owned subsidiary of Defendant PRA Group, Inc.

17.     Defendant PRA Group, Inc., formerly known as "Portfolio Recovery Associates, Inc.", is a publicly traded Delaware corporation that buys consumer debt from the originating creditor, or from another debt-buyer, and then initiates, directly or indirectly, collections, or attempted collections, of consumer debts that were owed or due, or asserted to be owed or due, to the originating creditor.  PRA Group, Inc. maintains offices at 120 Corporate Boulevard, Norfolk, Virginia 23502.  PRA Group, Inc.'s securities are traded on the Nasdaq, under the ticker symbol PRAA.  PRA Group, Inc. describes itself as "a global leader in acquiring non-performing loans."

18.     Defendant Malen & Associates, P.C. is a law firm, located at 123 Frost Street, Westbury, New York 11590, that has been retained by PRA to collect on consumer debt that PRA has purchased.  Pursuant to that retention, Malen files and maintains actions in New York State courts seeking collection.  As part of the filing of each such case, Malen, as it is obligated to do under New York State law, includes a certification pursuant to Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1-a.

## CLASS ALLEGATIONS

19.     This action is brought on behalf of Plaintiff individually and as a class action on behalf of the following class ("Class"):

> All persons against whom Defendants obtained default judgments related to the collection of consumer debt as to which Defendants had insufficient admissible evidence of the existence thereof.  Excluded from the Class are the officers and directors of any Defendant at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns,

and any entity in which any Defendant has or had a controlling interest.

20.     While the exact number of Class members can only be determined through

appropriate discovery, Plaintiff believes that there are thousands of members of the Class.

21.     Plaintiff's claims are typical of the claims of the other members of the Class, as

all members of the Class are similarly affected by Defendants' wrongful conduct, as complained

of herein.

22.     There are common questions of law and fact affecting members of the Class,

which common questions predominate over questions that might affect individual members.

These questions include, but are not necessarily limited to, the following:

    a.    Whether PRA engaged in debt purchase transactions without verifying the validity of the alleged debts that it was purchasing;

    b.    Whether Defendants had sufficient evidence of the existence of the alleged consumer debts when they obtained default judgments;

    c.    Whether the alleged debtors were furnished with evidence of the alleged consumer debts;

    d.    Whether Defendants filed materially deceptive affidavits in conjunction with its litigation-based debt collection activities;

    e.    Whether Plaintiff and the other members of the Class are entitled to damages, including punitive damages, costs, and/or attorneys' fees, for Defendants' acts and conduct as alleged herein, and the proper measure thereof.

23.     Plaintiff will fairly and adequately represent the Class members.  Plaintiff has no

interests that conflict with the interests of other Class members.  Plaintiff has retained counsel

competent and experienced in the prosecution of class action litigation.

24.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members might be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

25.     Members of the Class can be identified from records maintained by Defendants, and can be notified of the pendency of this action by United States mail using a form of notice customarily used in similar class actions.

**FACTS**

**PRA**

26.     Debt collection litigation has surged nationwide.  PRA has filed hundreds of thousands of collection lawsuits against consumers nationwide during the Class Period.  These lawsuits are targeted at those least able to defend themselves.  For example, in New York State, only roughly 2% of all residents sued in debt-collection lawsuits have been represented by counsel.[12]

27.     As of December 31, 2014, PRA had, over the course of its corporate life thus far, expended a total of roughly $3.82 billion to acquire roughly 37.6 million individual debts allegedly owed by United States consumers.  These purported debts had a total face value of roughly $82.6 billion—in other words, PRA purchased them for less than **5%** of face value. PRA spends hundreds of millions of dollars on debt each year.  In 2014, PRA Group, Inc. acquired North American and European debt portfolios valued at $1.43 billion; roughly $408.7 million was spent on portfolios containing North American-based debt allegedly owed by

---

[12]  *See* Susan Shin & Claudia Wilner, New Econ. Project, *The Debt Collection Racket in New York: How the Industry Violates Due Process and Perpetuates Economic Inequality* 3 (2013), annexed hereto as Exhibit C.

consumers such as Plaintiff and the other members of the Class.

28.     PRA collects hundreds of millions of dollars each year from American consumers, with a substantial portion of those sums stemming from the efforts of external-law-firm debt collectors, such as Malen.  In 2014, PRA collected a total of nearly $742.9 million from United States consumers such as Plaintiff and the other members of the Class.  Nearly $202.7 million, or approximately 27%, of the total amount resulted from external legal collections.  In 2013, by comparison, PRA collected a total of slightly more than $656.5 million, with nearly $192.4 million, or roughly 29%, arising from external legal collections.

29.     The vast majority of the purported consumer debt that PRA purchases is, by PRA's own admission, stale.  Consumer accounts that PRA identifies as "fresh"—that is, charged off, but no more than 270 days past due—comprise just 10% of PRA's life-to-date domestic portfolio purchases.  By enforcing old phantom debts, PRA ensures that consumers will be unable to recall what, if anything, they might have owed on the underlying accounts.

30.     As detailed by the CFPB's consent order with PRA, PRA purchases in bulk purportedly delinquent credit card and other accounts—the phantom consumer debts.  Prior to purchase, information about the relevant portfolio of alleged debts is transmitted to PRA electronically in the form of a spreadsheet.  The spreadsheet contains a list of accounts in the portfolio, as well as account-specific information such as each consumer's name, Social Security number, last known address and telephone number, the account number, charge-off date, date and amount of last payment, and alleged amount owed.[13]

31.     As of the time PRA completes a purchase of a portfolio of phantom debts, PRA is on notice that the electronic spreadsheet submitted to PRA prior to purchase is replete with

---

[13] *See* Consent Order, *supra* note 1, at 7.

inaccuracies.  This is because the seller, through the purchase agreement, disavows responsibility for the accuracy of the data contained in the spreadsheet.  For example, PRA is aware that some account balances would not have been reduced by a consumer's post-charge-off payments to the selling entity.

32.     Each purchase agreement typically will also state that PRA has performed an independent analysis of the alleged debts contained in the subject portfolio.  According to the CFPB, however, PRA frequently performs no such analysis in conjunction with either the purchase or its subsequent efforts to collect on the alleged debts within a portfolio.

33.     Finally, each purchase agreement typically contains clauses that make it impossible or prohibitively expensive for PRA to secure the evidence—that is, the account-level documentation—necessary to prove that a consumer owes a purported debt.  These clauses generally notify PRA: (1) that the selling entity is obligated to provide account-level documentation for only a fraction of the accounts sold, without informing PRA beforehand which accounts lack such documentation; (2) that PRA will be charged a fee for each account-level document it requests from the selling entity; (3) that such fees will increase after a certain period of time has elapsed or after PRA has requested a threshold number of documents; and (4) that PRA is forbidden from requesting account-level documentation from the original creditor.

34.     PRA only purchases its phantom debts from a limited number of Sellers, which include some of the largest banks and financial services corporations in the United States.  Upon information and belief, PRA typically buys portfolios from each Seller on more than one occasion, and thus fosters continuing business relationships with most, if not all, of the Sellers.

35.     While fully aware that it cannot actually demonstrate the existence of any of the debts that it has purchased, let alone the exact amount possibly owed thereupon, PRA files debt-

collection lawsuits in state and local courts, and then prosecutes those actions through to default judgment. Lacking the requisite evidentiary support for its claims,[14] PRA's sole intention is to obtain default judgments without ever having had admissible prima facie evidence to substantiate its claims. During the Class Period PRA has filed hundreds of thousands of debt-collection lawsuits nationwide.

36. PRA misrepresents to its victims that the decision to pursue legal action against them was the result of individualized legal analysis by an attorney. In truth, PRA selects phantom debts for legal action through a computerized scoring model. While less than 5% of the accounts that PRA purchases are referred for litigation-based collection efforts, such efforts generally account for nearly one-third of PRA's total collections revenue.

37. Upon information and belief, at least 90% of the lawsuits that PRA files against consumers result in default judgments. This is because the vast majority of the legal actions that PRA files go uncontested, allowing PRA to collect on alleged debts that either are invalid or have an improperly inflated face value.

38. Although PRA knows that much of the information that it receives from sellers at the time of portfolio purchase is inaccurate, PRA and its outside law firms presume that this information **is** accurate **unless** a consumer comes forward with proof to the contrary. The CFPB's consent order illustrates PRA's strategy of surreptitiously shifting the burden of proof onto consumers. The consent order discusses an instance in which a PRA senior manager expressed concerns about the fact that the information provided to PRA by sellers contains inaccuracies, and asked how PRA could be sure as to the precise amount that an individual consumer might owe if PRA has no knowledge of post-charge-off payments that would have

---

[14]   PRA's boilerplate complaints against individual consumers, in New York State and elsewhere, invariably set forth two causes of action: breach of contract and account stated.

reduced that amount.  PRA's Vice President for Collections responded, "We don't.  90% of our cases are default judgments.  We show the judge the math and if no one disputes we get our judgment.  Debtor has the right to defend and prove us wrong.  If they show payments we've missed we amend the complaint."[15]  It is a violation of the FDCPA to falsely represent the amount of an alleged debt, or to collect any amount not expressly authorized by the agreement that gave rise to the alleged debt.[16]

39.    PRA secures its default judgments by filing misleading affidavits when it applies for such relief.  Each such affidavit falsely asserts that the affiant, a PRA employee, has personal knowledge of the account-level documentation necessary to support a prima facie case as to PRA's claims.  By way of example, the boilerplate language from these affidavits contains the following statements:

> "This affidavit is based upon my **personal knowledge** . . . and **my review** of . . . the business records transferred to [PRA] from [the entity that sold PRA the portfolio containing the subject account]"; and

> "According to the records transferred to [PRA] from [the seller] . . . there was due and payable from [the consumer-defendant] to [the seller] the sum of [the alleged debt amount] . . . with there being **no known un-credited payments**, counterclaims or offsets against the said debt as of the date of the sale."

40.    These representations are false and materially misleading.  PRA employees cannot have legally sufficient personal knowledge of account-level documentation created by the original creditor prior to PRA's acquisition of the account, because PRA's professional robosigners generally do nothing more than glance at figures on a computer screen in creating the affidavits.  Further, PRA intentionally avoids acquiring knowledge that a consumer-

---

[15]  Consent Order, *supra* note 1, at 7.

[16]  *See* 18 U.S.C. §§ 1692e(2)(A), 1692f(1).

defendant has made post-charge-off payments that reduced the amount of the purported debt.[17]

**Malen**

41.     PRA would be unable to successfully and efficiently execute its fraudulent scheme without the assistance of the outside law firms that conspire with PRA to maintain collections lawsuits without evidentiary bases.  Accordingly, PRA and its outside counsel form a joint enterprise engaged in an ongoing fraudulent scheme.

42.     Malen is a New York law firm that PRA retains to collect on the consumer accounts that it purchases.  Pursuant to this retention, Malen has, among other things, maintained thousands of lawsuits against Plaintiff and the other members of the Class without ever having conducted a reasonable investigation as to the facts that Malen was alleging on PRA's behalf.

43.     According to the CFPB, "[o]ver a three year period, PRA placed tens of thousands of [d]ebts with [l]aw [f]irms staffed by fewer than five attorneys.  For example, PRA placed approximately 27,000 [d]ebts with a New York law firm employing just three attorneys . . . .  PRA does not set a limit on the number of [d]ebts it will place with a [l]aw [f]irm based on the number of attorneys employed by the firm."[18]  Upon information and belief, Malen is that New York law firm.

44.     Like all New York State attorneys, Malen's lawyers are obligated, under Rules of the Chief Administrator of the Courts (22 NYCRR) §§ 130-1.1 & 130-1.1-a, to conduct a reasonable investigation into the legal and factual basis of any civil action that they maintain on a client's behalf.

45.     Malen has engaged in a pattern and practice of: (1) using boilerplate complaints to

---

[17]  *See* Consent Order, *supra* note 1, at 7–8.

[18]  *See id.* at 12, ¶ 46.

make factually unsupportable attestations against Plaintiff and the other members of the Class; and (2) enabling the resulting actions to proceed through to default judgment.  Malen does not—and, in many instances, **cannot**—conduct any meaningful investigation, whatsoever, into the validity of the factual allegations and corresponding legal arguments that it makes on PRA's behalf.

46.     Upon information and belief, PRA prohibits Malen from directly contacting original creditors and/or debt-sellers so as to obtain the account-level documentation that would substantiate the causes of action that Malen prosecutes on PRA's behalf.  In addition, prior to filing PRA neither itself reviews any of the pleadings that Malen drafts, nor requires Malen, pursuant to its retention agreement, to review account-level documentation in preparing to file a suit on PRA's behalf.  While Malen has been aware that PRA's practice is to acquire purported debt without the account-level documentation that would establish the validity thereof (and without the ability to obtain such supporting documentation), and that it is also PRA's practice to provide robosigned affidavits created by persons unfamiliar with the requisite evidence, Malen has still agreed to maintain lawsuits on PRA's behalf despite knowing that no reasonable investigation into the validity thereof could have been performed.

47.     Malen ensures the success of PRA's fraudulent scheme by preparing and filing the motions and supporting documents necessary to secure default judgments.  Upon information and belief, Malen also alerts PRA's team of professional robosigners whenever one of PRA's boilerplate affidavits needs to be concocted in conjunction with an application for default judgment.  Malen thus takes advantage of the fact that, in New York State, default judgments are, for the most part, issued as a ministerial function by clerical personnel who rely upon the honesty, integrity, and ethics of the attorneys who seek default judgments on their clients'

behalves.

48.     PRA's fraudulent litigation strategy, as perpetuated by Malen and PRA's other outside counsel, constitutes precisely the type of malfeasance that Chief Judge Lippman, the New York State Attorney's General Office, the New York State Department of Financial Services, and the New York State Legislature had in mind when they announced last year that debt-buyers such as PRA would no longer be able to abuse New York's judicial system as they had in years past: "[I]n practice default judgments are obtained on the basis of 'robosigned' affidavits containing hearsay allegations . . . . Creditors frequently secure default judgments for the wrong amount of money or even against the wrong party . . . ."[19]

49.     "[U]nwarranted default judgments[] often [have] devastating consequences for the debtor—typically a lower-income New Yorker struggling to support a family and find or maintain a job."[20]   Upon information and belief, thousands of New York residents have been subjected to such unjust consequences—including garnishment of hard-earned wages—as a result of PRA's pattern and practice of fraudulently securing default judgments with the assistance of Malen and its other outside law firms.   PRA's profitability is dependent on such outcomes: its recovery rate for post-suit collections is three times greater than that for its other collection methods.

**Plaintiff**

**Mary Ellen Toohey**

50.     On or about June 6, 2012, Portfolio Recovery Associates, LLC, represented by Malen, commenced an action against Plaintiff Mary Ellen Toohey in Monroe County Supreme

---

[19]   Press Release, N.Y. State Unified Court Sys., s*upra* note 8.

[20]   *Id.* (internal quotation marks omitted).

Court, under Index Number 12-6293.  This action sought $976.08 (inclusive of interest), under the theories of both breach of contract and account stated, for a debt that allegedly was incurred to HSBC Bank Nevada, N.A., and then allegedly assigned to Portfolio Recovery Associates, LLC.

51.     On or about February 22, 2013, Malen, on behalf of PRA, filed an application for default judgment in this action against Ms. Toohey.

52.     Submitted in conjunction with this application was an affidavit from PRA employee Yvette M. Stephen, who identified herself as a records custodian for Portfolio Recovery Associates, LLC.  Through this affidavit, Ms. Stephen testified that, among other things:

> "This affidavit is based upon my personal knowledge . . . and my review of . . . the business records transferred to [PRA] from **HSBC BANK NEVADA, N.A./ORCHARD BANK**"; and

> "According to the records transferred to [PRA] from [HSBC] . . . there was due and payable from [Ms.] Toohey[] to [HSBC] the sum of $923.05 . . . with there being no known un-credited payments, counterclaims or offsets against the said debt as of the date of the sale."

53.     Ms. Stephen's affidavit did not identify any account-level documentation substantiating her attestations concerning the validity of the debt allegedly owed by Ms. Toohey, nor was any such documentation attached as exhibits to the affidavit (or to any other part of the default judgment application filed by Malen on PRA's behalf).

54.     This application for default judgment was granted by the Monroe County Clerk on or about March 18, 2013.  With costs and fees added to the amount sought in the underlying complaint, the total amount of the default judgment was $1,405.04.

55. On or about May 8, 2013, Malen caused an income execution to be issued by the Monroe County Sheriff's Office to Ms. Toohey's employer in conjunction with the recently granted default judgment.

56. On or about November 10, 2014, Malen filed a satisfaction of judgment notice concerning the default judgment against Ms. Toohey. This notice reflected that PRA had garnished Ms. Toohey's wages in the amount of $1,405.04.

### AS AND FOR A FIRST CAUSE OF ACTION

**(FAIR DEBT COLLECTION PRACTICES ACT)**
**(Against All Defendants)**

57. Plaintiff repeats and realleges each and every paragraph set forth above as though fully set forth below.

58. Plaintiff is a "consumer," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(3).

59. PRA is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

60. Malen is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

61. The FDCPA was enacted to stop "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

62. The FDCPA identifies sixteen specific, nonexclusive prohibited debt collection practices, and generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt." Among the acts prohibited are the false representation of "the character, amount, or legal status of any debt,"

15 U.S.C. § 1692e(2)(A), and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt[,]" 15 U.S.C. § 1692e(10).

63.     The FDCPA also prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.

64.     Defendants violated the FDCPA by making false and misleading representations, using deceptive means, and engaging in unfair and abusive practices.  Defendants' violations include, but are not limited to, the following:

    a.     participating in the preparation and filing of fraudulent, deceptive, and misleading affidavits and affirmations in order to obtain thousands of default judgments against Plaintiff and the other members of the class, as described herein;

    b.     participating in the preparation and filing of fraudulent, deceptive, and misleading affidavits and affirmations to influence and pressure consumers in order to obtain settlements from Plaintiff and the other members of the class, as described herein; and

    c.     using the fraudulently obtained default judgments to compel local law enforcement officials to effectuate the garnishment of victims' wages.

65.     The acts and practices herein set forth were deceptive, misleading, and fraudulent. Plaintiff and the Class have been damaged as a result of these violations, and are entitled to relief as provided for by 15 U.S.C. § 1692k.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>

**(RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT)**
**(CIVIL REMEDIES)**
**(Against All Defendants)**

66.     Plaintiff repeats and realleges each and every paragraph set forth above as though fully set forth below.

67.     Plaintiff is a natural person, and thus is a "person" as that term is defined by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1961(3).

68.     Defendants are corporate entities, and thus are "person[s]" as that term is defined by RICO, *see* 18 U.S.C. § 1961(3).

**The Enterprise**

69.     Upon information and belief, PRA and Malen are two distinct groups of persons that together constitute an "enterprise" as that term is defined by RICO, *see* 18 U.S.C. § 1961(4). Each defendant is employed by or associated with this enterprise ("Enterprise").

70.     Upon information and belief, PRA and Malen, taken together, are an association-in-fact pursuant to RICO, *see* 18 U.S.C. § 1961(4).

71.     The purpose of the Enterprise is to secure default judgments against Plaintiff and the other members of the Class through fraudulent means, and to leverage these fraudulently obtained default judgments into wage garnishments, among other methods of extracting money from Plaintiff and the other members of the Class.

72.     This fundamental goal of the Enterprise is effectuated as follows: (1) PRA purchases phantom debts; (2) PRA, through both its in-house attorneys and outside counsel (including Malen), commences debt-collection actions in state and local courts, despite lacking corroborative account-level documentation and/or personal knowledge thereof; (3) employees of

PRA, at counsel's direction, fill out the boilerplate affidavits that falsely imply actual review and personal knowledge of account-level documentation; (4) counsel acting on PRA's behalf submit these materially misleading affidavits in support of applications for default judgments; (5) PRA and counsel use these fraudulently obtained default judgments to, among other things, compel local sheriff's departments to issue income executions as to consumer-defendants; (5) money is thus extracted from these consumer-defendants, often in the form of wage garnishments; (6) if outside counsel, such as Malen, has represented PRA in a matter, it earns a contingency fee on the money unlawfully extracted from the consumer-defendant; and (7) PRA's ill-gotten gains allow it to purchase even more phantom debt from the Sellers, which not only strengthens the financial positions of the Enterprise's individual participants, but also increases the efficiency with which the Enterprise achieves its fundamental goal.

73.     The relationships between the participants in the Enterprise are longstanding and ongoing.

74.     The Enterprise has for many years—but, at the very least, since July 21, 2011—been engaged in, and continues to engage in, activities that affect interstate commerce.  The Enterprise, which is in violation of RICO, has been, and remains, longstanding, continuous and open-ended.

**Pattern of Racketeering Activity: Mail Fraud, Wire Fraud, and Bank Fraud**

75.     Defendants, individually and collectively, through their participation in the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

76.     Defendants, acting individually and as participants in the Enterprise, have devised and perpetuated a scheme to deceive judicial systems and law enforcement officials, and to

obtain money or property through false or fraudulent pretenses and representations. This scheme includes, but is not limited to, the following acts:

a.   participating in the preparation of affidavits falsely implying personal knowledge and actual review of account-level documentation relevant to debts allegedly owed by Plaintiff and the other members of the Class, when in fact no such personal knowledge is possessed and no such actual review has occurred;

b.   filing these materially misleading affidavits for the purpose of fraudulently securing default judgments against Plaintiff and the other members of the Class;

c.   using these fraudulently obtained default judgments to compel local sheriff's departments to issue income executions that cause garnishments of the wages of Plaintiff and the other members of the Class;

d.   using the interstate mails and wires to receive their fraudulently obtained gains.

77.   Defendants, acting individually and as participants in the Enterprise, have made fraudulent misrepresentations on specific occasions, including: on or about February 22, 2013, Defendants filed an application for default judgment against Ms. Toohey, which filing contained an affidavit by a PRA employee in which that affiant falsely stated that there existed sufficient documentation of a debt and that she had personal knowledge of, and had herself reviewed, the account-level documentation pertinent to PRA's causes of action against Ms. Toohey.

78.   Defendants, acting individually and as participants in the Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew that the mails and wires would be used, in furtherance of the fraudulent scheme as described above. Namely:

a. In an affirmation, a Malen attorney attested that a copy of the summons in the action against Ms. Toohey was sent to Ms. Toohey by U.S. mail on August 6, 2012.

b. Upon information and belief, at some point between June 6, 2012 and January 28, 2013, Malen, using either the interstate mails or the wires, contacted PRA so as to request that PRA produce the materially misleading affidavit ultimately created by Ms. Stephen.

c. Upon information and belief, at the direction of Malen, a member of the Monroe County Sheriff's Office sent a notice of income execution to Ms. Toohey via U.S. mail at some point between May 8, 2013 and November 10, 2014.

d. Upon information and belief, at some point between May 8, 2013 and November 10, 2014, PRA used the interstate mails or wires to receive the moneys over which it had improperly secured control via the income execution resulting from its fraudulently obtained default judgment against Ms. Toohey.

e. Defendants have used the mails and wires on tens, if not hundreds, of thousands of other occasions that Plaintiff cannot identify presently, but that are known to Defendants.

79.     Defendants have used the mails and wires in connection with every default judgment that they have fraudulently obtained, and each such use has furthered the fraudulent scheme and enabled Defendants to take money and/or property from Plaintiff and the other members of the Class through misrepresentations and false pretenses.

80.     Upon information and belief, PRA and Malen each have specific knowledge that the mails and wires have been, and are being, utilized in furtherance of the overall purpose of

executing the fraudulent scheme, and/or that it was reasonably foreseeable that the mails and wires would be so used, because the governing state-level civil procedure law, including the New York Civil Practice Law and Rules, require that the mails and/or wires be utilized in conjunction with the prosecution of civil actions such as those that Defendants have prosecuted against Plaintiff and the other members of the Class.  Notably, it would be impossible to obtain a default judgment in most jurisdictions without at least half-a-dozen uses of the mails and wires.

81.     Further, the Enterprise has engaged in bank fraud.   Defendants, acting individually and as participants in the Enterprise, have obtained moneys and/or other property under the custody or control of a financial institution by means of misrepresentations and fraudulent pretenses, in furtherance of the scheme as described above.  Namely: on or about May 8, 2013, a Malen attorney—citing the default judgment against Ms. Toohey that had been fraudulently obtained in PRA's favor through the submission of the materially misleading affidavit filled out by Ms. Stephen—compelled the Monroe County Sheriff's Office to direct Ms. Toohey's employer to cause the diversion, for PRA's benefit, of moneys that would otherwise flow from the employer's bank account to Ms. Toohey as wages for work performed.

82.     Defendants have, through fraudulently obtaining default judgments against Plaintiff and the other members of the Class, improperly obtained moneys and/or other property that was under the custody or control of financial institutions on a number of occasions that Plaintiff cannot ascertain presently, but that is known to Defendants.

83.     Each of the thousands of uses of the mails and wires, and of instances of improperly obtaining control of moneys and/or other property under the custody or control of financial institutions, that occurred in connection with the fraudulent scheme as described above, spanned a period of at least four years, and constitutes a separate instance of, respectively, mail

fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344, and thus is also a predicate act, which acts, taken together, constitute a "pattern of racketeering activity" for the purposes of 18 U.S.C. §§ 1961(1), 1961(5) & 1962.

84.     The acts of racketeering activity that occurred in connection with the fraudulent scheme as described above took place after the effective date of RICO, 18 U.S.C. § 1961 et seq., and on countless occasions over a substantial time period within ten years of each other.  These acts of racketeering are an ongoing part of Defendants' regular way of doing business.  The predicate acts have been, and will be, repeated over and over again.

**Relationship of the Pattern of Racketeering Activity to the Enterprise**

85.     As detailed above, the purpose of the Enterprise is to secure default judgments through fraudulent means, and to use those fraudulently obtained judgments to extract money and/or property from Plaintiff and the other members of the Class, including through wage garnishments.

86.     The pattern of racketeering activity described above is integral to the fraudulent scheme that Defendants perpetuate.  Without engaging in mail and wire fraud, Defendants would be unable to secure default judgments against their victims.  Without engaging in bank fraud, Defendants would be unable to turn their default judgments into profits.

87.     Defendants, individually and as participants in the Enterprise, have each conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above.  As such, each Defendant has violated 18 U.S.C. § 1962(c).

88.    In addition, each Defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including through the numerous predicate acts of mail, wire, and bank fraud as described above, and has thus violated 18 U.S.C. § 1962(d).

89.    As a direct and proximate result of the RICO violations described herein, Plaintiff and the other members of the Class have suffered considerable injuries.  They have been deprived of due process.  They have had money judgments unlawfully entered against them. They have had their wages unlawfully garnished.  Their credit scores have been negatively affected, perhaps irreparably.  The list goes on.  These extreme and unjust consequences of Defendants' improper conduct in violation of 18 U.S.C. § 1962(c) & (d) amount to injury to property of Plaintiff and the other members of the class within the meaning of 18 U.S.C. § 1964.

90.    Defendants' misrepresentations to the judicial system secured the default judgments that caused concrete injury to the property of Plaintiff and the other members of the Class.  As a result, the actions of Defendants in violation of 18 U.S.C. § 1962(c) & (d) have caused Plaintiff and the other members of the Class to suffer damage to their property within the meaning of 18 U.S.C. § 1964.

91.    Defendants' conduct has involved, and continues to pose, a threat of long-term criminality, as it is believed to have commenced more than a decade ago, and has continued through to the present.  The pattern of racketeering as described above has been directed towards tens, if not hundreds, of thousands of persons, including Plaintiff, and this pattern has spanned many years.

92.    For the violations of 18 U.S.C. § 1962 described herein, Plaintiff and the other members of the Class are entitled to recover compensatory and treble damages in an amount to

be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION

### (N.Y. GEN. BUS. LAW § 349)
### (Against All Defendants)

93.     Plaintiff repeats and realleges each and every paragraph set forth above as though fully set forth below.

94.     Plaintiff is a New York consumer entitled to the protection afforded under Article 22-A of the General Business Law ("GBL"), entitled "Consumer Protection from Deceptive Acts and Practices."

95.     GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful."

96.     A GBL § 349 cause of action accrues when consumer-oriented conduct is deceptive and materially misleading to a reasonable consumer, and causes actual damages.

97.     Defendants' acts and omissions are directed at consumers and include, but are not limited to:

      a.     using fraudulent, deceptive, and misleading affidavits and affirmations to obtain default judgments against Plaintiff and the other members of the class, as described above;

      b.     maintaining actions against consumers without sufficient factual basis, and using fraudulent, deceptive, and misleading affidavits and affirmations to influence and pressure consumers in order to obtain settlements from, or garnish

the wages of, Plaintiff and the other members of the class, as described above; and

c.   commencing actions against consumers without sufficient factual basis, predicated upon false allegations and knowing misrepresentations, yet backed by an attorney's certification pursuant to Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1-a.

98.   The acts and practices herein set forth were deceptive, misleading, and fraudulent. As a result of such acts and practices, Plaintiff and the other members of the Class were injured, suffered damages, and are entitled to relief as provided for by GBL § 349(h).

## AS AND FOR A FOURTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
### (Against All Defendants)

99.   Plaintiff repeats and realleges each and every paragraph set forth above as though fully set forth below.

100.   Plaintiff and the other members of the class have paid substantial amounts to PRA and Malen in the form of wage garnishments and attachments from default judgments, as well as settlements, obtained through the use of fraudulent, deceptive, and misleading affidavits and affirmations against Plaintiff and the other members of the class, as described above.

101.   Defendants gained monetary benefits in the form of payments on such default judgments and settlements, as well as the resulting fees, to which Defendants were not entitled. Defendants never possessed, or could ever possess, the prima facie evidence necessary to prove claims brought against Plaintiff and the Class.   Thus, Defendants would have obtained no monetary benefit at all with respect to the debt-collection actions at issue here had they not manipulated the New York State court system as described above.

102.    Allowing PRA and Malen to retain these monetary benefits, which were obtained through fraud, deceit, or misrepresentation, would be unjust.  PRA and Malen should not be so unjustly enriched, and the monies collected should be returned to Plaintiff and the other members of the class.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule Tolling

103.    Plaintiff could not have discovered, through the exercise of reasonable diligence, within the time period of any of the applicable statutes of limitation, that Defendants had perpetrated their fraudulent scheme against her.

104.    Plaintiff did not know, and could not have known, essential elements of her claim until the publication of the CFPB's Consent Order on September 8, 2015, including that the PRA employees who fill out PRA's affidavits do not actually conduct a review of account-level documentation, often do not possess the documentation they purport to possess, and do not possess the personal knowledge of that documentation that they allege.

105.    Therefore, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiff and the other members of the Class have as a result of Defendants' fraudulent scheme by virtue of the discovery rule doctrine.

### Fraudulent Concealment Tolling

106.    Throughout the time period relevant to this action, Defendants affirmatively concealed from Plaintiff and the other members of the Class the fraudulent scheme described herein.  As such, neither Plaintiff nor the other members of the Class could have discovered, even upon reasonable exercise of diligence, that Defendants had secured default judgments against them through the fraudulent scheme described herein.

107. Among other things, the false and misleading statements contained in the affidavits that were created by PRA's employees, and that Malen and PRA's other outside law firms filed on PRA's behalf in support of PRA's applications for default judgments against Plaintiff and the other members of the Class, concealed the existence of Defendants' fraudulent scheme.

108. Therefore, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiff and the other members of the Class have as a result of Defendants' fraudulent scheme until September 8, 2015 by virtue of the fraudulent concealment doctrine.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, demands judgment as follows:

i) Declaring this Action to be a proper plaintiff's class action, declaring Plaintiff to be a proper representative of the Class, and declaring Plaintiff's Counsel to be class counsel;

ii) On the First Cause of Action, under the FDCPA, awarding Plaintiff and the other members of the Class statutory and actual damages as provided by 15 U.S.C. § 1692k;

iii) On the Second Cause of Action, under RICO, awarding Plaintiff and the other members of the Class compensatory and treble damages in an amount to be determined at trial;

iv)    One the Second Cause of Action, under RICO, granting a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future;

v)    On the Third Cause of Action, under New York's Unfair and Deceptive Trade Practices Act, awarding such preliminary injunctive and ancillary relief as might be necessary to avert the likelihood of consumer injury during the pendency of this action; and entering a permanent injunction to prevent future violations of the GBL by Defendants;

vi)    On the Third Cause of Action, under New York's Unfair and Deceptive Trade Practices Act,, awarding statutory and actual damages as provided by GBL § 349(h);

vii)    On the Fourth Cause of Action, for Unjust Enrichment, requiring PRA and Malen to pay full restitution to all members of the proposed Class to the extent that Defendants have collected monies upon the purported debts and/or default judgments entered;

viii)    Awarding Plaintiff costs and expenses, including reasonable attorneys' fees and expenses; and

ix)    Granting such other and further relief as the Court might deem just and proper.

Dated:    New York, New York
             October 14, 2015

                                Respectfully submitted,

                                **FRANK LLP**

                                By:   /s/ Gregory A. Frank
                                Gregory A. Frank (GF 0207)
                                Marvin L. Frank (MF 1436)
                                275 Madison Avenue, Suite 705
                                New York, New York 10016
                                Tel: (212) 682-1853
                                Fax: (212) 682-1892
                                info@frankllp.com