# Exhibit A

Part I

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

ADMINISTRATIVE PROCEEDING
File No. 2015-CFPB-0023

_____
                                            )
                                            )
In the Matter of:                           )     **CONSENT ORDER**
                                            )
                                            )
                                            )
Portfolio Recovery Associates, LLC          )
                                            )
                                            )
_____ )

     The Consumer Financial Protection Bureau ("Bureau") has reviewed the practices of Portfolio Recovery Associates, LLC ("Respondent") regarding its purchase of charged-off consumer debts from original creditors and other debt buyers, and its subsequent collection efforts including filing lawsuits against consumers, and has identified violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a)(1), and sections 807, 807(2)(A), 807(5), and 807(10) of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e, 1692e(5)and 1692(e)(10)). Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

# I.

## Jurisdiction

1.     The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565 as well as under section 814(b) of the FDCPA, 15 U.S.C. § 1692l(b).

# II.

## Stipulation

2.     Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

# III.

## DEFINITIONS

The following definitions must apply to this Consent Order:

3.     "Affidavit" means those affidavits, declarations, verifications, or any sworn statements that are used in Legal Collection.

4.    "Board" means the duly elected and acting Board of Directors of Respondent's parent company, PRA Group, Inc.

5.    "Charge-off" means the treatment of a receivable balance by a Creditor as a loss or expense because payment is unlikely.

6.    "Charge-off Balance" means the amount alleged due on an account receivable at the time of Charge-off.

7.    "Clearly and Prominently" means:

    a.  as to written information, written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer. If the information is contained in a multi-page print document, the disclosure appears on the first page;

    b.  as to information presented orally, spoken and disclosed in a volume, cadence and syntax sufficient for an ordinary consumer to hear and comprehend.

8.    "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

9.    "Creditor" means any person who was owed a Debt which was not in default at the time it was obtained by such person.

10.     "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

11.     "Debt Collection Lawsuit" means any lawsuit filed by Respondent, or on behalf of Respondent by a Law Firm, against any Consumer for the purpose of collecting any Debt.

12.     "Effective Date" shall mean the date on which the Consent Order is issued.

13.     "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegee.

14.     "Law Firm" shall refer to those third-party law firms retained by Respondent for the purpose of conducting debt collection activities on Respondent's behalf, including litigation.

15.     "Legal Collection" means any collection efforts made by Respondent's internal legal department or a Law Firm to collect Respondent's Debt, including but not limited to sending letters on Law Firm letterhead and filing Debt Collection Lawsuits.

16.     "Original Account-Level Documentation" means:

> a. any documentation that a Creditor, or that Creditor's agent (such as a servicer) provided to a Consumer about a Debt; or

       b.   a complete transactional history of a Debt created by a Creditor, or that Creditor's agent (such as a servicer);or

       c.   a copy of a judgment, awarded to a Creditor.

17.   "Portfolio" means a collection of Debt sold to Respondent in a single transaction.

18.   "Related Consumer Action" shall mean a private action by or on behalf of one or more consumers or an enforcement action by another government agency brought against Respondent based on substantially the same facts as set forth in Section IV.

19.   "Relevant Time Period" means  the period from July 21, 2011 to the Effective Date.

20.   "Respondent" means Portfolio Recovery Associates, LLC and its successors and assigns.

21.   "Restitution Eligible Consumer" means any Consumer who made a payment, directly or indirectly, to Respondent:

       a.   during the Relevant Time Period on judgments obtained from Time-Barred Debt Collection Lawsuits ("Time-Barred Debt Restitution"), or

       b.      between July 21, 2011 and July 17, 2014, within 60 days

of receiving a call from PRA's Litigation Department and after

agreeing to make a payment where (1) the Debt had not yet

been placed with an attorney; and (2) the Consumer was not

informed during the call that the Debt had not been reviewed

by an attorney ("Litigation Department Calls Restitution").

22.    "Seller" means any person that sells any Portfolio to Respondent.

23.    "Time-Barred" when used to describe a Debt means any Debt that is beyond

an applicable statute of limitations for a Debt Collection Lawsuit.

## IV.

## Bureau Findings and Conclusions

The Bureau finds the following:

24.    PRA is a debt purchaser and collector headquartered in Norfolk, VA. PRA is

one of the nation's largest buyers of defaulted loans, credit card accounts, car loans and

other debts, which it purchases from creditors at a substantial discount to the face value

of the debts. PRA has also purchased in the past from other debt buyers. It then attempts

to collect these debts.

25.    PRA collected Debt related to consumer financial products or services.

Accordingly, PRA is a "covered person" as defined by the CFPA, 12 U.S.C. § 5481(6). *See

also* 12 U.S.C. § 5481(5) and (15)(A)(x). PRA is also a "debt collector" as defined in

Section 803(6) of the FDCPA. 15 U.S.C. § 1692a(6).

26.    In 2013, PRA purchased more than $4.7 billion of charged-off Debts from banks, consumer and auto finance companies, and retail merchant finance companies.

## PRA'S DEBT BUYING PRACTICES

27.    Prior to PRA purchasing a Debt Portfolio, PRA typically receives an electronic file ("Sale File"), from the Seller that includes information about the Consumers and the Debts, including, but not limited to, name, address, social security number, as well as the current balance, contract interest rate, and dates of origination, last payment, and charge-off.

28.    PRA is aware that significant inaccuracies may exist in the Sale Files it purchases, including that some Debts' balances were not reduced by a consumer's subsequent payments. For instance, when a PRA senior manager raised a concern about the poor quality of sellers' balance information and asked how PRA can know actual balances owed if it does not receive information on post charge-off payments, PRA's Vice President for Collections responded, "We don't. 90% of our cases are default judgments. We show the judge the math and if no one disputes we get our judgment. Debtor has the right to defend and prove us wrong. If they show payments we've missed we amend the complaint."

29.    Language in PRA's purchase agreements puts PRA on notice that information in the Sale File might be inaccurate, incomplete, or otherwise unreliable. For example, a debt seller may have specifically disclaimed the accuracy of information in the Sale File, notified PRA that documentation is unavailable, or notified PRA that a

percentage of accounts in a portfolio are disputed or barred by the applicable statute of limitations. For example, a 2009 purchase agreement with one large bank explicitly stated that account balances are "approximate" and "may not reflect credits for payments made by or on behalf of the [consumer] prior to the cut-off date."

30.    The purchase agreements stated that PRA was purchasing the loans based on PRA's independent examination, study, inspection and knowledge of the loans. However, PRA did not routinely check the account information in the Sale Files it purchased against the original creditor's records before contacting consumers, even when it knew or should have known the Sale File contained unreliable information.

31.    Some of PRA's purchase agreements put limitations on the availability of account-level documents, thus putting PRA on notice that it may not be able to access account-level documentation on all accounts purchased that would enable it to perform proper due diligence on Sale Files whose accuracy PRA has reason to doubt, investigate consumer disputes, or prove its case in contested litigation. Limitations on the availability of account-level documents in PRA's contracts included:

      a.  notifying PRA that supporting documents may only be available for a percentage of the accounts, but not identifying which accounts lacked documentation;

      b.  charging PRA a fee for each supporting document it requested;

      c.  increasing the per-document fee after PRA requests a certain percentage of documents from that Debt Portfolio or requests documents after a certain

date (*e.g.*, $1 per document after year one, $5 per document after year two); or

  d.  prohibiting PRA from contacting the original creditor for information or supporting documents.

32.    A Seller's failure to provide media has never led PRA to terminate a contract or renegotiate its terms.

## PRA'S PRACTICES RELATED TO CONSUMER DISPUTES

33.    PRA did not monitor its portfolios of debts for accuracy. PRA relied primarily on consumer disputes to determine whether a portfolio was unreliable and would assume its accuracy unless consumers came forward with evidence of problems in material numbers. However, until March 2012, PRA did not even track consumer disputes by Seller to determine whether a particular portfolio of loans it purchased was unreliable.

34.    Prior to February 2013, PRA did not routinely request account-level documentation  if a Consumer disputed the Debt in writing more than 30 days after PRA sent a notice of debt pursuant to section 809 of the FDCPA, 15 U.S.C. § 1692g.  Rather, PRA's policy stated that "ordering documents will be at the discretion of the dispute department since it is not mandated that we order them" and that PRA was "under no obligation to investigate" the disputed debt's validity before continuing collection.

35.    PRA does not investigate oral disputes. If consumers do not put their oral disputes in writing within 14 days, PRA will continue to demand payment without

determining the Debt's legitimacy.

36.    PRA did not alter its collection practices when collecting on Portfolios that it knew or should have known contained unreliable information. Consumers receiving collection attempts from PRA had no way of knowing that PRA had reason to suspect the accuracy of the information.

<u>PRA'S PRACTICES RELATED TO OBTAINING CONSENT TO COMPUTER DIAL CONSUMERS' CELL PHONES</u>

37.    PRA representatives sometimes use a computer dialing system to place calls to phone numbers associated with PRA accounts.  Federal law prohibits using an auto-dialer to dial a Consumer's cell phone without that Consumer's express consent.

38.    For approximately a year, and ending in August 2013, PRA gained or attempted to gain consumers' consent by representing to Consumers that they can only prevent collection calls to their cell phones before 9 a.m. if they consent to receive computer dialing system calls on their cell phones. If a representative manually dials a Consumer's cell phone and reaches the Consumer, PRA's policy until August 2013 was to require the representative to ask for the Consumer's consent to add the cell phone number to the computer dialing system in return for preventing calls to the Consumer's cell phone before 9 a.m. PRA penalized representatives who failed to adhere to this policy.

39.    The FDCPA currently contains a provision prohibiting debt collectors from calling Consumers at an "unusual" or "inconvenient" time, presumed to be before 8 a.m. or after 9 p.m. local time. 15 U.S.C.§ 1692c.

PRA'S PRACTICES RELATED TO LEGAL COLLECTIONS

40.    PRA represented to Consumers expressly or by implication that their Debts have been selected for legal action based on a review by an attorney. In fact, PRA used a computerized scoring model to select Debts for Legal Collections. This scoring model selected approximately 4.5% of PRA's Debts for referral to Legal Collections. The 4.5% of Debts that entered this channel were the source of 28% of PRA's total collections revenue. PRA collected approximately $319 million through its legal collections channel in 2013 alone.

41.    Once PRA refers a Debt for Legal Collection, specialized collectors contact the Consumer and attempt to arrange a settlement of the Debt. In most instances, no attorney has reviewed these Debts prior to these settlement efforts.

42.    On numerous occasions, these collectors, who identify themselves as the Litigation Department, made statements to Consumers such as "[PRA] will move forward with [its] litigation process" unless the consumer makes a payment to "stop the lawsuit." When Consumers hesitated to accept the payment plan, the Litigation Department collectors on numerous occasions countered with statements such as "You know that this is the Litigation Department, right?" or stated that the purpose of the call is "to see if we can get this resolved without the matter going to court." Prior to July 17, 2014, Collectors from the Litigation Department did not disclose whether or not an attorney had reviewed the Consumer's Debt.

43.     Despite repeated references to "litigation" during the legal collections process, PRA in numerous instances had not reviewed or decided whether to file suit at the time collectors make those statements.

## PRA'S LITIGATION PRACTICES

44.     PRA uses dozens of law firms across the country to file approximately 3,000 suits every week. Consumers respond to less than six percent of those actions. In 2012 alone, PRA's internal and external counsel filed over 160,000 Debt Collection Lawsuits in state and local courts.

45.     PRA's recovery rate for post-suit collections is three times larger than PRA's recovery rates from other collection channels.

46.     Over a three year period, PRA placed tens of thousands of Debts with Law Firms staffed by fewer than five attorneys. For example, PRA placed approximately 27,000 Debts with a New York law firm employing just three attorneys and 21,000 Debts with a North Carolina law firm employing only five attorneys.  PRA does not set a limit on the number of Debts it will place with a Law Firm based on the number of attorneys employed by the firm.

47.     PRA did not require its Law Firms to review account-level documents prior to filing suit. PRA prohibited them from contacting the original creditor or debt sellers directly to request such documents. PRA does not review pleadings before outside counsel files them.

48.     PRA did not inform its Law Firms when an original creditor or debtor has specifically disclaimed the accuracy or validity of the Debt, has notified PRA that documentation is unavailable for some Debts, or notified PRA that a percentage of Debts in a portfolio are disputed or barred by the applicable statute of limitations.

<u>PRA'S MISLEADING COLLECTION AFFIDAVITS</u>

49.     In many jurisdictions, PRA has been able to obtain a settlement or a default judgment against a Consumer using an Affidavit as its only evidence. PRA also uses Affidavits as proof in contested matters.

50.     In Affidavits used to support PRA Debt Collection Lawsuits, PRA's affiants on many occasions represented that they have personal knowledge of original creditors' account-level documentation corroborating consumers' debts when in fact they did not. For example, PRA affiants testified:

> a.  "This affidavit is based upon my personal knowledge . . . and my review of . . . the business records transferred to Account Assignee from [Account Seller]";
>
> b.  "I am authorized to make the statements ... herein, and do so based upon a review of . . . account records transferred to Account Assignee from [Account Seller]";

c.    "According to the records transferred to the
Account Assignee from Account Seller, and
maintained in the ordinary course of business by
the Account Assignee, there was due and payable
from [Consumer] to the Account Seller the sum of
$[Debt] with respect to [account number], as of
[date of sale] with there being no known un-
credited payments, counterclaims or offsets against
the said debt as of the date of the sale."

51.    In numerous instances, affiants made the representations discussed in the
preceding paragraph after merely reviewing a computer screen containing the scant
information produced by Sellers in data files and not after a review of any account level
documents such as account applications, terms and conditions of contracts, payment
histories, monthly credit card statements, or charge slips.

52.    PRA's affiants on numerous occasions represented that the terms and
conditions document attached to the Affidavit specifically applied to the Consumer's
Debt.

53.    In fact, in numerous instances, the attached terms and conditions were
often generic and did not necessarily apply to the Consumer's Debt.

54.    In numerous instances, PRA through its affiants represented directly or indirectly, expressly or by implication that they have knowledge of the content of an account agreement.

55.    In fact, in certain instances the affiants could not have such knowledge because in the same filings, PRA represented it was unable to locate the agreement the affiant would have to review to gain that knowledge.

### PRA'S COLLECTION OF TIME-BARRED DEBT

56.    PRA occasionally threatened or filed suit on Debt that was past the applicable statute of limitations.

57.    After learning that it had obtained judgments on Debts that were beyond the statute of limitations, PRA did not move to vacate these judgments or otherwise remediate those Debts that had already been reduced to judgment.

58.    In numerous instances from at least January 1, 2009 to March 1, 2012, PRA collected Time-Barred Debt by falsely representing that Consumers had a legally enforceable obligation to pay the Debt.

59.    In numerous instances prior to March 1, 2012, PRA sent letters containing time-limited settlement offers that failed to disclose that the debt it was collecting was too old for litigation. PRA's letters seeking to settle Time-Barred debt contained statements such as, "These savings won't last long . . . ," "CALL NOW to take advantage of these limited time offers," "Your first payment must be received NO LATER than . . . ," and "Your account will be considered 'Settled in Full' after your final payment is posted."

## Violations of the Consumer Financial Protection Act

60.    Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA.  12 U.S.C. §§ 5531 and 5536(a)(1)(B).

61.    Respondent is a "covered person" within the meaning of the CFPA, 12 U.S.C. § 5481(6).

62.    Respondent made numerous misrepresentations to Consumers in connection with attempting to collect Debts, a Consumer financial product or service.

### False or Unsubstantiated Representations About Owing a Debt, in Violation of the CFPA

63.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that Consumers owed Debts to Respondent with certain unpaid balances, interest rates, and payment due dates. Respondent further represented to Consumers directly or indirectly, expressly or by implication, that Respondent had a reasonable basis for representing that Consumers owed the claimed Debts to Respondent.

64.    In truth and in fact, in numerous instances the representations set forth in Paragraph 63 were false or were not substantiated at the time the representations were made, including but not limited to where:

     a.     Consumers disputed, challenged, or questioned the validity or accuracy of the Debt and Respondent failed to review information that would have been necessary to have a reasonable basis to continue collecting on that Debt; or

     b.     Respondent had knowledge or reason to believe, based on contractual terms or past performance of accounts sold by a seller, that a specific portfolio of accounts contained unreliable data, but Respondent failed to obtain and review information that would have been necessary to have a reasonable basis to collect on the Debt.

65.     The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt and are likely to mislead Consumers acting reasonably under the circumstances.

66.     The representations set forth in Paragraph 63 are false or misleading and constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresenting that PRA Intends to Prove the Debt, If Contested, in Violation of the CFPA

67.     In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers through litigation or threats of litigation, Respondent represented, directly or indirectly, expressly or by implication, that PRA intends to prove its claims, if contested.

68.    In truth and in fact, in numerous instances, Respondent did not intend to prove its claims, if contested.

69.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding whether to pay the Debt or contest the lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

70.    The representations set forth in Paragraph 67 are false or misleading and constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

<u>Filing Misleading Collection Affidavits in Violation of the CFPA</u>

71.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, in Affidavits filed in courts across the country, Respondent represented directly or indirectly, expressly or by implication, that:

        a.    PRA affiants had reviewed account-level documentation from the original creditor corroborating the Consumer's Debt;

        b.    Documents attached to affidavits were specific to the Consumer; or

        c.    PRA affiants were familiar with the content of account agreements.

72.    In truth and in fact, in numerous instances:

        a.    PRA's affiants had not reviewed account-level documentation from the original creditor corroborating the Consumer's Debt;

        b.    Documentation attached to affidavits was not specific to the

Consumer; or

c.   PRA affiants were not familiar with the content of account
agreements because, for example, the account agreements at issue
were no longer available for affiants to review.

73.   These representations are material because they are likely to affect a
Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to
mislead Consumers acting reasonably under the circumstances.

74.   The representations set forth in Paragraph 71 are false or misleading and
constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the
CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

Misrepresentations Regarding Time-Barred Debt, in Violation of the CFPA

75.   In numerous instances during the Relevant Period, in connection with
collecting or attempting to collect Debt that is beyond the applicable statute of limitations
from Consumers, Respondent represented, directly or indirectly, expressly or by
implication, that Consumers had a legally enforceable obligation to pay the Debt.

76.   In truth and in fact, Consumers do not have a legally enforceable obligation
to pay Debt that is beyond the applicable statute of limitations.

77.   These representations are material because they are likely to affect a
Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt
claim and are likely to mislead Consumers acting reasonably under the circumstances.

78.    The representations set forth in Paragraph 75 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

Misrepresentations Regarding Attorney Review

79.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt, Respondent represented to Consumers, directly or indirectly, expressly or by implication, that an attorney has reviewed the Consumer's Debt or that the collector is calling on the attorney's behalf.

80.    In truth and in fact, an attorney had not reviewed the Consumer's Debt and the collector was not calling on behalf of an attorney.

81.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt and are likely to mislead consumers acting reasonably under the circumstances.

82.    The representations set forth in Paragraph 79 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

Misrepresentations of Imminent Litigation

83.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt, Respondent represented to Consumers, directly or indirectly, expressly or by implication, that litigation was planned, imminent, or even underway.

Page 20 of 60

84.     In truth and in fact, litigation was not planned, imminent, or underway because PRA had not decided whether to file suit.

85.     These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt and are likely to mislead consumers acting reasonably under the circumstances.

86.     The representations set forth in Paragraph 83 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresentations about Computer Dialing System Calls

87.     In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt, Respondent represented to Consumers, directly or indirectly, expressly or by implication, that consumers cannot prevent collection calls on their cell phones before 9 a.m. local time unless they consent to receiving computer dialing system calls on their cell phones.

88.     In truth and in fact, in numerous instances, consumers can prevent collections calls on their cell phones before 9 a.m. local time even if they do not consent to receiving computer dialing system calls on their cell phones. Under Section 805(a)(1) of the FDCPA, PRA is prohibited from calling consumers at any time PRA knows or should know is inconvenient to consumers. Consumers can simply tell PRA that it is inconvenient to call before 9 a.m. local time and PRA is prohibited from doing so. Further, absent information to the contrary, Section 805(a)(1) requires debt collectors to

assume that the convenient time for communicating with consumers is after 8 a.m. local time.

89.     These representations are material because they are likely to affect a consumer's choice or conduct regarding whether to provide consent to receive computer dialing system calls on a cell phone and are likely to mislead consumers acting reasonably under the circumstances.

90.     The representations set forth in Paragraph 87 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Violations of the Fair Debt Collection Practices Act

91.     Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any debt. Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A) specifically prohibits the false representations of the character, amount, or legal status of any debt. Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5) specifically prohibits the threat to take any action that cannot legally be taken or that is not intended to be taken. Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), prohibits using false representations or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

92.     Respondent is a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6).

93.    Respondent made numerous representations to consumers in connection with attempting to collect debts arising out of transactions primarily for personal, family, or household purposes.

### False or Unsubstantiated Representations About Owing a Debt, in Violation of the FDCPA

94.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that Consumers owed Debts to Respondent with certain unpaid balances, interest rates, and payment due dates. Respondent further represented to Consumers directly or indirectly, expressly or by implication, that Respondent had a reasonable basis for representing that Consumers owed the claimed Debts to Respondent.

95.    In truth and in fact, in numerous instances the representations set forth in Paragraph 94 were false or were not substantiated at the time the representations were made, including but not limited to where:

a.    Consumers disputed, challenged, or questioned the validity or accuracy of the Debt and Respondent failed to review information that would have been necessary to have a reasonable basis to continue collecting on that Debt; or

b.    Respondent had knowledge or reason to believe, based on contractual terms or past performance of accounts sold by a seller, that a specific portfolio of accounts contained unreliable data, but Respondent

failed to obtain and review information that would have been necessary to have a reasonable basis to collect on the account.

96.    The representations set forth in Paragraph 94 are false or misleading and constitute deceptive acts or practices in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

### Misrepresenting that PRA Intends to Prove the Debt, If Contested, in Violation of the FDCPA

97.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers through litigation or threats of litigation, Respondent represented, directly or indirectly, expressly or by implication, that PRA intends to prove its claims, if contested.

98.    In truth and in fact, in numerous instances, Respondent did not intend to prove its claims, if contested.

99.    The representations set forth in Paragraph 97 are false or misleading and constitute deceptive acts or practices in violation of Sections 807, 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10).

### Filing Misleading Collection Affidavits, in Violation of the FDCPA

100.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, in affidavits filed in courts across the country, Respondent represented directly or indirectly, expressly or by implication, that:

        a.      PRA affiants had reviewed account-level documentation from the original creditor corroborating the consumer's debt;

        b.      Documents attached to affidavits were specific to the consumer; or

        c.      PRA affiants were familiar with the content of account agreements.

101.   In truth and in fact, in numerous instances:

        a.      PRA's affiants had not reviewed account-level documentation from the original creditor corroborating the consumer's debt;

        b.      Documentation attached to affidavits was not specific to the consumer; or

        c.      PRA affiants were not familiar with the content of account agreements because, for example, the account agreements at issue were no longer available for affiants to review.

102.   The representations set forth in Paragraph 100 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

Misrepresentations Regarding Time-Barred Debt, in Violation of the FDCPA

103.   In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt that is beyond the applicable statute of limitations from Consumers, PRA represented, directly or indirectly, expressly or by implication, that Consumers had a legally enforceable obligation to pay the Debt.

104.    In truth and in fact, Consumers do not have a legally enforceable obligation to pay Debt that is beyond the applicable statute of limitations.

105.    The representations set forth in Paragraph 103 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, 807(2)(A), 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10).

### Misrepresentations of Attorney Review

106.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that an attorney has reviewed the Consumer's Debt or that the collector is calling on the attorney's behalf.

107.    In truth and in fact, an attorney had not reviewed the Consumer's Debt and the collector was not calling on behalf of an attorney.

108.    The representations set forth in Paragraph 106 are false or misleading and constitute a deceptive act or practice in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

### Misrepresentations of Imminent Litigation

109.    In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that litigation is planned, imminent, or even underway.

110.   In truth and fact, litigation was not planned, imminent, or underway because PRA had not decided whether to file suit.

111.   The representations set forth in Paragraph 109 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, 807(2)(A), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(10).

<u>Misrepresentations about Computer Dialing System Calls</u>

112.   In numerous instances during the Relevant Period, in connection with collecting or attempting to collect Debt from Consumers, Respondent represented, directly or indirectly, expressly or by implication, that consumers cannot prevent collection calls on their cell phones before 9 a.m. local time unless they consent to receive computer dialing system calls on their cell phones.

113.   In truth and in fact, in numerous instances, consumers can prevent collections calls on their cell phones before 9 a.m. local time even if they do not consent to receiving computer dialing system calls on their cell phones. Under Section 805(a)(1) of the FDCPA, PRA is prohibited from calling consumers at any time PRA knows or should know is inconvenient to consumers. Consumers can simply tell PRA that it is inconvenient to call before 9 a.m. local time and PRA is prohibited from doing so. Further, absent information to the contrary, Section 805(a)(1) requires debt collectors to assume that the convenient time for communicating with consumers is after 8 a.m. local time.